**FURGANG & ADWAR LLP**
Armando Llorens
1325 Avenue of the Americas
28th Floor
New York, New York 10019
Telephone: (212) 725-1818
Facsimile: (212) 353-1996

*Proposed Counsel for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GLOBAL ENERGY EFFICIENCY HOLDINGS, INC.,<br><br>                        Debtor. | Chapter 11<br><br>Case No. 16-10289 (JLG) |

**DECLARATION OF VLADIMIR REYNOSO PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**

      I, Vladimir Reynoso, declare pursuant to section 1746 of title 28 of the United States Code, that:

      1.      I am the Chief Executive of Officer Global Energy Efficiency Holdings, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), a corporation organized under the laws of the State of New York.

      2.      In accordance with S.D.N.Y. Local Bankruptcy Rules ("L.B.R.") 1007-2, I submit this declaration ("Declaration") in connection with the order for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by the Debtor in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on February 7, 2016 (the "Petition Date") and in support of the Debtor's other pleadings.

1

3. I am generally familiar with the business and financial condition of the Debtor. In making any and all financial representations in this Declaration, I am relying on my own personal knowledge and on financial statements and other financial information as compiled, prepared and/or submitted to me by other officers or employees of the Debtor. Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

4. If I were called to testify, I would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the Debtor.

I.  **Required Contents of Affidavit**

A.  **Nature of Debtor's Business and Circumstances Leading to Bankruptcy Filing**

   (i) **Nature of the Business**

5. The Debtor is an energy efficiency solutions company providing a comprehensive array of energy efficiency products and solutions, focused on the installation and servicing of lighting, refrigeration equipment, and HVAC upgrades/retrofits to reduce energy consumption and provide substantial cost savings to its clients.

6. The Debtor was founded in 2009 and completed its first project in 2010. In January 2011, the Debtor began participation in the Con Edison ("Con Edison") Commercial & Industrial Energy Efficiency Incentive Program (the "Energy Efficiency Incentive Program"). In 2012 the company was accepted into the Con Edison Small Business Direct Installation Program. The Debtor is paid incentives through programs developed by Con Edison, among others, which are designed to save energy consumption.

7. The Debtor grew quickly by posting revenues of nearly $400,000 in 2010, $3 million in 2011, $8 million in 2012 and $13 million in 2013. Due to this growth the Debtor

2

secured a credit line of $3 million from Full Circle Capital Corp. ("Full Circle") in September of 2012. By December of 2013, the Full Circle line had grown to nearly $7 million. Also due to the vast opportunity for energy solutions in the market place and the growing trend of the company in the last three years, the Debtor planned and set a higher goal for the year 2014. Accordingly, the company negotiated a term loan and credit line from Manufacturers and Traders Trust Company ("M&T Bank") for a total of $9 million and paid off its debt to Full Circle.

8. As more fully described below, the filing of the Petition was precipitated by M&T Bank seizing all monies of the Debtor held in its M&T Bank accounts, totaling approximately $76,000. In addition, M&T Bank filed a complaint on January 16, 2016 in the Supreme Court of the State of New York, Bronx County, seeking an injunction directing the Sheriff of Bronx County to seize the collateral securing the Debtor's loan. The hearing on this matter was scheduled to be heard on February 8, 2016 at 9:30 a.m.

9. The Debtor currently employs 39 employees from a high of over 130 in 2014, as more further described below. Fifteen (15) employees receive salaries and twenty four (24) employees receive hourly wages. None of the employees are unionized.

**(ii) Circumstances Leading to Bankruptcy Filing**

    a. **Ramifications of Changes to Con Edison Energy Efficiency Incentive Program**

10. In early 2014, the Debtor used the added working capital to hire personnel and purchase materials, thereby positioning its resources to support its projected growth. Towards the second quarter of 2014, however, Con Edison made unexpected changes to the Energy Efficiency Incentive Program in which the Debtor was participating. These changes, with less favorable incentives and delays with regard to (i) the timing of the new program changes and (ii)

3

the Con Edison approval process, led to operational challenges and financial losses for the Debtor. The enlarged salesforce had already "sold" a very large number of projects. The delayed approval process led to the Debtor incurring significant expense while being unable to book and ultimately collect on the initial sales which awaited, and in many cases, never received approval from Con Edison. Significant project cancelations caused by these delays and customer dissatisfaction led to significant losses and working capital depletion. Also during this time, Con Edison reneged on paying the Debtor approximately $1.2 million due to an error it claimed in the paperwork submissions relating to the new Program requirements.

11.     In July 2014 Con Edison fired one of their contractors (Lockheed Martin) with which the Debtor worked to process its projects. The projects were passed on to another contractor named Willdan Energy Solution ("Willdan"). The transition to Willdan was highly detrimental to the Debtor as further strains were experienced related to liquidity and working capital. It took Willdan approximately seven (7) months to process payments due to the Debtor totaling approximately $1 million, which payments would have been otherwise paid by September 2014. The Debtor finished the 2014 fiscal year with revenues of $10.8 million, down $2.2 million from the previous year and a loss before provision for income taxes in the amount of $5.5 million.

12.     As a function of the challenged performance, the Debtor took aggressive action to right-size its expense structure in an effort to achieve profitability. To date, the workforce has been reduced to 39 employees from a high of over 130 employees in 2014.

13.     Calendar year 2015 was similarly challenging, constrained by poor liquidity, Incentive Program challenges and lack of support from financing partners. The company is

4

projecting its revenue for fiscal year ending 12/31/2015 to be $5 million with a $2.5 million loss from operations.

### b. Pre-Petition Secured Credit Agreement and Secured Creditor Action

14. The Debtor is a party to a certain pre-petition secured financing agreement with M&T Bank (hereinafter, the "Secured Creditor"), as further described in the Debtors' Cash Collateral Motion (as defined below) (collectively, as amended, supplemented and otherwise modified from time to time, the "Pre-Petition Secured Credit Agreement"), in the outstanding amount as of the Petition Date of approximately $8,533,180.36.

15. To evidence the loans and advances made by the Secured Creditor to the Debtor, the parties executed (i) a certain Revolving Line Note dated as of January 15, 2014 in the amount of $5 million plus accrued interest, (ii) a General Security Agreement dated as of July 21, 2014 and (iii) a certain Amended and Restated Credit Agreement dated as of September 14, 2014. Pursuant to the Amended and Restated Credit Agreement, the Revolving Line Note was reduced to $4.8 million.

16. To evidence the loans and advances made by the Secured Creditor to the Debtor, the Debtor also executed a certain U.S. Small Business Administration Note dated as of January 15, 2014 (the "SBA Note") pursuant to which the Debtor would pay M&T Bank the sum of $4,113,200 or if less, if the aggregate unpaid principal amount due under the SBA Note, together with accruing interest.

17. The Debtor's obligations under the Notes were personally guaranteed by (i) the undersigned, (ii) Lissette Reynoso (the Debtor's President) and (iii) Maximo Cenento (the Debtor's Chief Sales Officer")

18. The Pre-Petition Secured Credit Agreement is secured by all inventory, goods, office furniture and equipment, accounts receivable and all books and records relating thereto in the

Debtor's possession or control (collectively, the "Collateral").[1] The Secured Creditor perfected its interests in the Collateral by filing UCC-1 Financing Statements with the New York Secretary of State.

19. In or around June 2015, the Debtor suffered from a lack of liquidity and declining revenue and allegedly defaulted under the Pre-Petition Secured Credit Agreement by, among other things, failing to meet certain financial covenants and make certain payments when due thereunder.

20. On January 19, 2016, the Secured Creditor filed a Complaint in the Supreme Court of the State of New York, County of Bronx, Index No. 20283/2016E, against the Debtor and its principals, asserting breach of the Pre-Petition Security Agreement and seeking an injunction directing the Sheriff of Bronx County to seize the Collateral securing the Debtor's loan. Prior to the filing the Complaint, the Secured Creditor seized all monies held in the Debtor's M&T Bank accounts totaling approximately $76,000.

21. Pursuant to an independent third party appraisal as of September 22, 2015 (the "Appraisal"), obtained by the Secured Creditor and conducted by Nassau Asset Management, the Collateral has a combined value in the range of $81,000 - $216,000, with an estimated specific value of $135,000, as, the Appraisal concludes, there is no established secondary market for this type of Collateral. A copy of the Affidavit of Michael Steinberger, Vice President of M&T Bank, stating this assertion is attached as Exhibit 1 to the Cash Collateral Motion.

22. The filing of the Petition was necessary to preserve the value of the Collateral and maintain the Debtor's business as a going concern. The Debtor believes that the chapter 11

---

[1] For further background and details with respect to the Pre-Petition Secured Credit Agreement, interested parties are referred to the Cash Collateral Motion.

process will allow it to maximize the value of its assets for all creditors, including the Secured Creditor and emerge as a profitable enterprise.

### c. The Debtors' Post-Petition Goals

23. The Debtor believes that the chapter 11 process affords a better opportunity to provide a greater return to its creditors than any alternative wind down or liquidation process.

24. The Debtor believes that through chapter 11, it can reorganize its business into a leaner, more efficient operation that can return to profitability with a restructured balance sheet, focused management, slimmed down expense structure and appropriate capitalization.

## B. The Debtor's Case Was Not Originally Commenced Under Chapter 7 Or Chapter 13

25. The Debtor's case was voluntarily commenced under chapter 11 and was not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code. Accordingly, L.B.R. 1007-2(a)(2) is inapplicable.

## C. Pre-petition Creditors' Committee

26. In accordance with L.B.R. 1007-2(a)(3), to the best of the Debtor's knowledge, no pre-petition creditors' committee was formed prior to the Petition Date.

## D. Twenty Largest General Unsecured Creditors

27. In accordance with L.B.R. 1007-2(a)(4), a consolidated list setting forth the Debtor's twenty (20) largest unsecured creditors, excluding those persons who constitute "insiders" under Bankruptcy Code section 101(31), is annexed hereto as <u>Exhibit A</u>. As required by L.B.R. 1007-2(a)(4), <u>Exhibit A</u> includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed, or partially secured.

### E. Five Largest Secured Creditors

28. In accordance with L.B.R. 1007-2(a)(5), a consolidated list setting forth the Debtor's five (5) largest secured creditors is annexed hereto as <u>Exhibit B</u>. As required by L.B.R. 1007-2(a)(5), <u>Exhibit B</u> includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, a description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.

### F. Summary of the Debtor's Assets and Liabilities

29. A summary of the Debtor's assets and liabilities, as required by L.B.R. 1007-2(a)(6), will be filed when the Debtor's Schedules are completed.

### G. Publicly Held Stock

30. As required by L.B.R. 1007-4(a)(7), no classes of shares of stock, debentures, or other securities of the Debtor are publicly held. The Debtor's outstanding stock is owned by:

(a) Vladimir Reynoso

(b) Lissette Reynoso

(c) Maximo Centeno and

(d) Estate of Jhonny Jaar

### H. Debtors' Property Held By Others

31. No property of the Debtor is in possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity. Accordingly, L.B.R. 1007-2(a)(8) is inapplicable.

### I. Debtor's Office Space

32. As required by L.B.R. 1007-2(a)(9), the Debtor leases its office space located at 14 Bruckner Blvd., Bronx, New York 10454.

### J. Location of the Debtors' Assets and Books and Records

33. Pursuant to L.B.R. 1007-2(a)(10), the Debtor's substantial assets and their books and records are located at the leased premises located at 14 Bruckner Blvd., Bronx, New York 10454. The Debtor does not have any assets held outside of the territorial limits of the United States.

### K. Pending or Threatened Actions

34. Pursuant to L.B.R. 1007-2(a)(11), In addition to the Secured Creditor Action, a list of pending or threatened actions against the Debtor is as follows:

   a. Claim for $82,000 filed by Wesco Distribution Inc. for the Debtor's alleged failure to pay for electrical materials. The Wesco Litigation is pending before the Supreme Court of the State of New York, County of Bronx, Index No. 20344/2016E.

   b. Claim for $142,000 filed by NewOak Capital Markets, LLC for the Debtor's alled breach of contract for financial advisory private placement fees. The NewOak Litigation is pending before the Supreme Court of the State of New York, New York County, Index No. 650866/2014.

   c. Claim for $95,000 filed by General Supply & Services Inc. d/b/a Gexpro for the Debtor's alleged failure to pay for electrical materials. The Gexpo Litigation is pending before the before the Supreme Court of the State of New York, County of Bronx, Index No. 26311/2015E.

### L. Senior Management

35. Pursuant to L.B.R. 1007-2(a)(12), the Debtor's senior management consists of:

   a) Vladimir Reynoso, Chief Executive Officer and Secretary

   b) Lisette Reynoso, President

   c) Miguel Companioni, Chief Financial Officer

   d) Maximo Centeno, Chief Sales Officer

### M. Weekly Payroll

36. Pursuant to L.B.R. 1007-2(b), the Debtor intends to continue the operation of its business and the management of its property as a debtor and debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

37. Pursuant to L.B.R. 1007-2(b)(1), for the thirty (30) day period following the Petition Date, the Debtor intends to pay employees (exclusive of officers, directors, stockholders, partners, and members) approximately $115,000. The hourly wage employees receive approximately $10,000 in gross wages per week and the non-executive salaried employees receive approximately $37,500 in gross wages every two weeks.

### N. Payroll for Officers

38. Pursuant to L.B.R. 1007-2(b)(2)(A), the amount paid and proposed to be paid for the thirty (30) day period following the Petition Date for services rendered by officers, stockholders and directors is approximately $45,000, or $22,500 every two weeks.

39. Pursuant to L.B.R. 1007-2(b)(2)(C), the Debtor expects to retain Rock Shelter Capital, LLC, as its financial advisor.

40. In accordance with L.B.R. 1007-2(b)(3), a schedule of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but

remain unpaid will be filed with the Court prior to the first day hearing and attached as an Exhibit to the Cash Collateral Motion.

## II. Additional Information In Support of First Day Motions

41. In order to continue operating effectively as debtors in possession, the Debtor requires approval of certain transactions and dealings immediately. Therefore, the Debtor is moving this Court for approval of certain "first day" matters in the instant case (collectively, the "First Day Motions").

42. I have reviewed each of the First Day Motions and believe the facts set forth therein are true. The First Day Motions, described below, require immediate approval in order for the Debtor's business to continue uninterrupted during the immediate post-petition period.

### i. Cash Collateral Motion

43. On February 8, 2016, the Debtor will file its Motion, Pursuant to 11 U.S.C. §§ 105, 361 and 363, for Entry of Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "Cash Collateral Motion").

44. Certain of the Collateral may constitute cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

45. Without immediate access to such Cash Collateral, the Debtor will be unable to fund its day-to-day business operations during the pendency of this chapter 11 case, which would adversely affect the value of the Debtor's business as a going-concern.

46. By the Cash Collateral Motion, the Debtor respectfully requests that the Court (i) enter the proposed Interim Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) and Granting of Adequate Protection Pursuant to 11 U.S.C. § 361 (the "Interim Cash

Collateral Order") authorizing the interim use of Cash Collateral on the terms and conditions set forth in the Interim Cash Collateral Order, and scheduling a Final Hearing on the Cash Collateral Motion; (ii) at the Final Hearing, enter an order to be filed by the Debtor with the Court (the "Final Cash Collateral Order" and, with the Interim Cash Collateral Order, the "Cash Collateral Orders") authorizing the continued use of Cash Collateral on the terms and conditions set forth in the Final Cash Collateral Order; and (iii) grant such other and further relief as is just and proper.

47. The Debtor did not contact the Secured Creditor prior to the filing of Cash Collateral Motion or seek the consensual use of Cash Collateral. The Debtor intends to seek the consent of the Secured Creditor promptly after the filing of the Motion. The Secured Creditor perfected liens and security interests in the Collateral by filing Uniform Commercial Code financing statements with respect thereto, as applicable.

48. The Cash Collateral Orders provide, among other things, that the Debtor shall be entitled to use the Cash Collateral in accordance with and subject to the terms and conditions set forth therein. Generally, Cash Collateral shall be used in accordance with and for the purposes described in the budget attached as an exhibit to the Cash Collateral Orders (the "Budget"), prepared by the Debtor. Key provisions of the Cash Collateral Orders are highlighted in the Cash Collateral Motion.

49. The Debtor's access to Cash Collateral is essential to enable the Debtor to maintain the value of its assets and business through the pendency of this chapter 11 case. If the Debtor is unable to use Cash Collateral, the going-concern value of its business will be irreparably harmed.

50. The Debtor's management has formulated the Budget for the use of the Cash Collateral that includes estimated expenses of the Debtor for the three month period following

the Petition Date. The Debtor believes that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of its business, as well as chapter 11 administrative expenses, for the period set forth in the Budget. The Debtor also believes that the use of Cash Collateral in accordance with the Budget will provide the Debtors with sufficient liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

51.    As indicated herein and in the Cash Collateral Motion, the interests of the Secured Creditor are adequately protected in that the Secured Creditor has itself valued the Collateral at $135,000. The Cash Collateral Orders provide the Secured Creditor with monthly cash payments as set forth in the Budget and, pursuant to Bankruptcy Code sections 361 and 363(e), to the extent of any diminution in the value of the Collateral resulting from (i) the use of the Cash Collateral pursuant to Bankruptcy Code § 363(e), (ii) the use, sale or lease of the Collateral (other than the Cash Collateral) pursuant to Bankruptcy Code § 363(c) or (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a), in the form of replacement security interests in and liens ("Replacement Liens") on all of the Debtor's right, title and interest in and to all assets and properties of the Debtor, whether existing as of the Petition Date or acquired thereafter, but excluding causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof, (collectively, the "Post-Petition Collateral") to the same extent, priority, validity and perfection as the Secured Creditor's pre-petition liens and security interests in the Collateral.

52.    The use of the Cash Collateral is essential to the successful outcome of the Debtor's Chapter 11 Case. The Debtor must be able to provide comfort to its vendors, its employees, and others that it will be able to pay in the ordinary course for all post-petition

13

purposes. Authorization of the use of Cash Collateral will provide the Debtor with the liquidity necessary to operate its business and to pay the wages, salaries, rent, utilities and other expenses associated therewith. Without authorization of the utilization of the Cash Collateral, the Debtor will likely be forced to terminate their operations and liquidate immediately.

### ii. The Other First Day Motions

53. In addition to the Cash Collateral Motion, the Debtor intends to seek relief from the Court at the first-day hearing in connection with each of the motions described below:

| Title | Purpose of Motion |
|---|---|
| Motion Seeking Authorization For (I) The Continued Use of the Debtor's Current Cash Management System, and (II) Authorizing Continued Maintenance Of Existing Bank Accounts And Business Forms | To facilitate uninterrupted operation of the business |
| Motion For Entry of an Order Extending the Debtor's Time to File Schedules of Assets and Liabilities, Schedules of Current Income And Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs | The Debtor requests a 30-day extension to file all schedules and statements of financial affairs. |
| Motion For Entry of Interim and Final Orders Authorizing, But Not Directing, Debtor To (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefit Programs | Authorization to pay prepetition wages and related employee benefits in order to maintain key employees and preserve employee morale. No employee will receive more than $12,475. |

### iii. Conclusion

54. The Debtor reserves the right to amend or supplement any of the attached schedules in the event additional information is obtained by the Debtor.

55. The Debtor believes that the protection of the Bankruptcy Code will enable it to maximize the value of its assets for the benefit of the estate and its creditors.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 8th day of February, 2016.

/s/ Vladimir Reynoso
Vladimir Reynoso

## **Exhibit A**

**Twenty Largest General Unsecured Claims**

**See Attached**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | **GLOBAL ENERGY EFFICIENCY HOLDINGS, INC** |
| United States Bankruptcy Court for the | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known) | |

☐ Check if this is an amended filing

Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case.  Include claims which
the debtor disputes.  Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | MANUFACTURERS AND TRADERS TRUST  1 M&T Plaza Buffalo, New York | | | Disputed | ,533,180.36 | ¦135,000.00 | ¦8,398,180.36 |
| 2 | Lumenor Energy Services® LLC 110 East Broward Boulevard, Suite 1700 Fort Lauderdale, FL | | Services | | | | $232,909.56 |
| 3 | Rockshelter Capital LLC 31 Rockshelter Road Waccabuc, NY 10597 | | Bond | | | | $150,000.00 |
| 4 | New Oak Capital Markets, LLC 485 Lexngton Avenue, 25th Floor New York, NY 10017 | | Services | Disputed | | | $142,580.00 |
| 5 | On Deck Capital 1400 Broadway, 25th Floor New York, NY 10018 | | Credit | | | | $120,000.00 |
| 6 | Selective Insurance Company of America 40 Wantage Avenue Branchville, NJ 07890-1000 | | Insurance | | | | $102,765.00 |

Official Form 204  Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims    page 1

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7 | Charles Newman c/o The Charles J. Newman Co., LLC 37 Saw Mill River Rd. Hawthorne, NY 10532 | | Bond | | | | $100,000.00 |
| 8 | Wesco Receivables Corp, Wesco Dist PO Box 641447 Pittsburgh PA 15264-1447 | | Supplies | Disputed | | | $82,663.70 |
| 9 | American Express P.O. Box 297879 Fort Lauderdale, FL 33329-7879 | | Credit Card | | | | $69,989.38 |
| 10 | Chase PO Box 15123 Wilmington, DE 19850-5123 | | Credit Card | Disputed | | | $57,993.94 |
| 11 | Gexpro (Cincinnati) 11400 Mosteller Rd Cincinnati, OH 45241 | | Supplies | Disputed | | | $55,144.23 |
| 12 | Keith Stephenson c/o NEW DIRECTION IRA 1070 West Century Drive, Suite 101 | | Bond | | | | $50,000.00 |
| 13 | Sager Electronics 2270 Cabot Blvd. West # 2 Langhorne, PA 19047 | | Supplies/Equipment | | | | $45,363.95 |
| 14 | McGladrey LLP 850 Canal Street, 4th Floor Stamford, CT 06902-6902 | | Services | | | | $30,500.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 15 Moso USA<br>13100 Alondra Blvd., Unit 106<br>Cerritos, CA 90703 | | Supplies | | | | $25,158.19 |
| 16 The Home Depot CC<br>2455 Paces Ferry Rd SE<br>Atlanta, GA 30339 | | Supplies | | | | $20,210.42 |
| 17 Cooper Electric Supply Co<br>1 Matrix Drive<br>Monroe NJ 08831-3798 | | Supplies | | | | $19,784.26 |
| 18 The Hartford<br>PO Box 660916<br>Dallas, Texas 75266-0918 | | Insurance | | | | $18,767.92 |
| 19 Spark Lighting Corp.<br>347 37th Street<br>Brooklyn NY 11232 | | Services | | | | $17,956.57 |
| 20 ENPAC Industries<br>34355 Melinz Parkway<br>Eastlake, OH 44095 | | Supplies | | | | $16,522.50 |

## Exhibit B

## Five Largest Secured Claims

| Creditor | Amount Secured | Value and Description of Collateral | Classification |
|---|---|---|---|
| Manufacturers and Traders Trust Company<br><br>1 M&T Plaza<br>Buffalo, NY 14203 | $135,000 | all inventory, goods, office furniture and equipment, accounts receivable and all books and records relating thereto in the Debtor's possession or control | |